IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEAN WARGO, Individually and as the Administratrix of the Estate of TRISTAN WARGO,<br>      Plaintiff<br><br>vs.<br><br>SCHUYLKILL COUNTY, et al.,<br>      Defendants | : JURY TRIAL DEMANDED<br>: CIVIL ACTION<br>: NO. 3:06-CV-2156<br>:<br>: JUDGE James M. Munley<br>:<br>:<br>:<br>: |

**CORRECTED STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON BEHALF OF SCHUYLKILL COUNTY-DEFENDANTS**

      The defendants, Schuylkill County, Eugene Berdanier, Acting Warden; Former District Attorney Frank Cori; President Judge William Baldwin; Lieutenant M. Flannery; and Lieutenant Scott Rizzardi [hereinafter "Schuylkill County defendants"], by and through their undersigned counsel, aver that the following facts are not disputed and may be considered by the Court in support of their Motion for Summary Judgment:

**OVERVIEW OF CLAIMS**

      1.     The plaintiff's decedent, Tristan Wargo (Tristan) committed suicide on November 6, 2004, while incarcerated at the Schuylkill County Prison.

      2.     The plaintiff claims that the individual prison defendants, Acting Warden Berdanier, Prison Counselor Kryjak, Lieutenant Flannery and Lieutenant Rizzardi, and other medical defendants were deliberately indifferent to decedent's medical needs. (Complaint, Document 1) (Count I).  That defendants, Schuylkill-County; Acting Warden Berdanier, and Prison Board member, Former District Attorney Frank Cori, and President Judge William Baldwin were deliberately indifferent to Tristan's constitutional right by failing to have certain written policies and practices (Complaint, Document 1, Count II).

3. The plaintiff's Complaint also includes pendent state claims under Pennsylvania's Wrongful Death (Count III) and Survival Act (Count IV) as to all defendants (Complaint, Document 1).

## **THE PARTIES**

4. The plaintiff is:

(a) Jean Wargo, Tristan's grandmother and Administratrix of his estate.

(b) Tristan did not reside with his grandmother and she suffered no monetary damages as a result of his death (Exhibit 59, Deposition Jean Wargo, NT 9-10)

(c) Jean Wargo did not know of any prior suicide attempt. Tristan never talked to her about any emotional problems (*Id.* NT 16).

(d) Jean Wargo spoke with Tristan 2 or 3 times while in prison. On those occasions, Tristan asked her to have his father come see him in prison. Two days before his death, Tristan called her to ask if she would put up her home for his bail. Jean Wargo apologized but said that pop (her husband/Tristan's grandfather) would never let her do that (NT 31). Tristan never told her of any problems he was having in jail, just that he wanted out (*Id.* NT 32). On October 28, 2004, Tristan robbed The Standard Drug Store, Hancock Street, McAdoo, Pennsylvania, utilizing a shotgun and taking approximately $7,000 in Oxycontin.

5. The remaining defendants are:

(a) Schuylkill County, Pennsylvania, is a county of the fourth class.

(b) Gene Berdanier (Acting Warden) was appointed warden in December 2004. Following the resignation of former Warden Gerald Britton on October 4, 2004. Berdanier served as defacto or acting warden.

(c) Frank Cori, Esquire, is a former District Attorney and former Chairman of the Schuylkill County Prison Board.

(d) Honorable William E. Baldwin is the President Judge of Schuylkill County and a member of the Prison Board.

(e) Michael Kryjak was the former Prison Counselor at the Schuylkill County Prison, now deceased.

2

(f) Lieutenant, now Captain Michael Flannery was a lieutenant and currently a captain. In November 2004, his duties involved supervising the dayshift.

(g) Lieutenant Rizzardi is a lieutenant at the Schuylkill County Prison who placed Tristan in Holding Cell No. 1 with one-hour checks on October 28, 2008 and thereafter, discovered Tristan hanging in his cell on November 6, 2004, at which time he notified emergency personnel and initiated CPR.

**ARMED ROBBERY & INCARCERATION**

6. On October 28, 2004, at approximately 0921 hours, an armed robbery was reported at the Standard Drug Store located at 322 South Hancock Street, McAdoo, Pennsylvania. On that date, Tristan Wargo enter the drug store with a black hood pulled tightly around his face, holding a long double barrel shotgun, demanded and robbed the drug store of its supply of Oxycontin (Exhibits 6-8).

7. Following investigation, Tristan Wargo was arrested. Wargo received Miranda warnings and thereafter, confessed to taking Oxycontin from the drug store with an unloaded gun (Exhibit 7-8).

8. Police Chief John Petrilla transported Tristan Wargo for his assignment before District Magistrate Judge Platchko (Exhibit 10; NT 5, 23-25). At that time, Tristan Wargo only stated that he wanted to put all of this behind him. Routine bail was set at approximately $50,000 straight cash and Officer Petrilla took Tristan Wargo to the Schuylkill County Prison arriving at 1945 hours. During the time of his transportation, Tristan Wargo did not make any threats of harm to himself or express any suicidal ideation. Tristan Wargo was quiet and remorseful (NT 24-25). On admission to he Schuylkill County Prison, Chief Petrilla did not have any conversation with Correctional Officer Wowak or Correctional Officer Murton about any unusual behavior or anything about suicidal ideation (NT 25-26).

9. On arrival at the Schuylkill County Prison, Correctional Officer Wowak and Correctional Officer Murton were the correctional officers on duty. On October 28, 2004, Tristan Wargo was committed to the Schuylkill County Prison on charges of robbery, aggravated assault, simple assault, recklessly endangering another person, theft by unlawful taking and receiving stolen property (Exhibits 6, 12).

3

10.     On intake screening, Tristan Wargo's behavior did not suggest a risk of suicide (Exhibit 13, Question 9).

11.     On intake screening, Tristan Wargo denied that he had been recently hospitalized or recently seen by any medical or psychiatric doctor for any illness (Exhibit 13, Question 15).

12.     On intake screening, Tristan Wargo disclosed back and heart problems (Exhibits 13 & 26).

13.     On intake, Tristan Wargo did not appear to be under the influence of alcohol or drugs.  Visible signs of withdrawal symptoms were noted.  Tristan Wargo reported being on medication (Exhibit 13, Questions 7, 8, 12).

14.     By reason of Tristan Wargo's self-report, following admission screening, Lieutenant Rizzardi was notified and placed Resident Wargo in medical holding cell H-1 and ordered a check every hour (Exhibits 48, 49, NT 22-23).

15.     Lieutenant Rizzardi was the Lieutenant on duty when Tristan was admitted.  Lieutenant Rizzardi stated that Tristan was quiet and self-reported anticipated withdrawal from Oxycontin.  By reason of his self-report, Lieutenant Rizzardi anticipated that Tristan would have withdrawal.  He ordered Tristan placed in a medical holding cell with one hour checks.  The reason for the housing status was listed as medical (Exhibits 17, 48, 49, NT 22-23).

16.     Tristan underwent medical evaluation on 10/28/04.  Examination revealed the following:

- Reported allergies in the nature of insomnia and nausea to Wellbutrin (not listed as a current medication).
- Medications listed as Oxycontin 80 mg. bid.; Neurontin, 400 mg., tid., Skelaxin 800 mg., tid., Spirazide daily.
- Medical history revealed took Oxycontin for 2 ½ years.  Deptracardia – MVP Hole in Heart – Heart Arrhythmia – Congenital Heart Disease – 5 Ruptured Discs in Back – Fell Down 18 Cement Steps – 3/02.
- On social history, Tristan reported smoking two packs of cigarettes per day for 9 years.  Tristan reported that he only used Oxycontin per prescription – will experience withdrawal (w/d).

> ➤ Physical examination was within normal limits (Exhibit 15).

17.   On October 30, 2004, at 6:45 a.m., while housed in Medical Holding Cell 1, Tristan told Correctional Officer Schlack "inmate told this C/O that he had 10-12 Oxycontin stuck in his rectum and then he stated that he took them.  Lt. notified" (Exhibit 19).

18.   On receipt of the Accident/Incident Report, Lieutenant Flannery went to Holding Cell #1 and spent 5-10 minutes with Resident Wargo sitting on the bed. Lieutenant Flannery found no evidence of consumption, i.e. a baggie.  Resident Wargo stated that he did not remember when he took the Oxycontin and appeared to Lieutenant Flannery "as normal as you and I'.  Nonetheless, Lieutenant Flannery directed that Resident Wargo be kept under observation in a holding cell, placed in a gown and ordered 15 minute checks (Exhibit 46, 47, NT 18-25, 58, Exhibit 17).

19.   On October 30, 2004, at 1:35 p.m., Correctional Officer Bevan filed an incident report stating "At above date & time, while doing checks, this C/O observed Res. Wargo, T. in Holding #1 with a handful of thread that he pulled off from his mattress.  Thread was removed from resident and mattress was also removed.  Res. Wargo T. was informed he would be charged for the price of a new mattress." Lieutenant Flannery was notified (Exhibit 20).

20.   Following the October 30, 2006, 1:35 p.m. Incident Report, Lieutenant Flannery did not change the order that Tristan be placed in a gown with 15-minute checks (Exhibit 48, ¶ 6).

21.   On October 31, 2004, at 12 noon, Correctional Officer Connors filed an incident report stating "On this date & time Res. Wargo T. was complaining to C/O Mendinsky that something was in his eye.  C/O Mendinsky looked and seen a staple sticking out of his eye.  At that time, Lt. Flannery was notified and came up to holding 1 and pulled it out" (Exhibit 21).  Lieutenant Flannery pulled the staple out.  In removing the stapled, Lieutenant Flannery put gloves on and pulled it out.  The staple was in Tristan's eyebrow to keep a piercing open (Exhibit 46, ¶ 7; Exhibit 47, NT 44-46).

22.   Lieutenant Flannery states that to his knowledge, Resident Wargo was never on actual suicide watch at any time while he was in the holding cell area (Exhibit

46, ¶ 10; 47, NT 53). Lieutenant Flannery did not view any of the incidents referenced above (Exhibits 19, 20, 21) as being Resident Wargo trying to harm himself, i.e. trying to commit suicide (Exhibit 46; ¶ 10; Exhibit 47, NT 58-59, 61).

23. On November 1, 2004, Tristan was seen by the prison counselor, Michael Kryjak, who reported as follows:

> "I met with said individual Res. T. Wargo individually in my office. While resident did not express any suicidal ideation, it does remain my view that it is appropriate to maintain observatory status on Resident due his actions here at SCP as well as resident's issues with prescription pain killer, including resident own admission to consuming 10 Oxycontin tablets in a plastic bag. Resident also reports medical issues – spitting up dark blood, as well as having chest pain. Recommendation – maintain current housing status with checks. Have resident seen medically to rule out medical issues." (Exhibit 22)

24. After the October 31, 2004 12 noon report, no other behavior incidents were noted or reported. Privileges were gradually restored as follows:

- On November 3, 2004, a uniform was provided.
- On November 4, 2004, 30-minute checks were ordered.
- On November 4, 2004, a blanket was given.
- On November 5, 2004, a regular tray was provided with plastic ware.

(Exhibits 16, 17)

25. On November 5, 2004, Tristan met with prison counselor, Michael Kryjak who reported:

- Res. Wargo T. reported no psychiatric history, rather his major complaint has been a medical issue focusing on his back.
- With his injury/condition, Res. developed a problem with the use of prescription pain pills.
- In view of no reported psychiatric history and no medical issues, it is this writer's recommendation that resident be placed in general population. At this time, the only available option would be E-block due to overcrowding. Resident is in agreement (Exhibit 23).

26. On November 5, 2004, at 1:10 a.m. Resident Wargo was transferred to E-block and placed in a single cell – E-12 (Exhibit 18), per the recommendation of Counselor Michael Kryjak (Exhibit 23).

27. On November 6, 2004, Correctional Officer Stephen Bloschichak performed a check at 2:25 p.m. At that time, Correctional Officer Bloschichak recalls seeing Resident Wargo standing in his cell, either by the desk or top bunk (Exhibit 50, ¶ 8; Exhibit 51, NT 21-22) (Exhibit 50, ¶ 8, Exhibit 51, NT 21-22)..

28. On November 6, 2004, Lieutenant Rizzardi made medication rounds at approximately 12:35 p.m. At that time, Lieutenant Rizzardi observed decedent hanging in his cell (Exhibit 25, Exhibit 48, ¶ 7, Exhibit 49, NT 30).

29. Lieutenant Rizzardi radioed for all guards and radioed to open the door to the cell. He ran into the cell to hold Tristan up to reduce the pressure on his neck. Lieutenant Rizzardi believed that Tristan was still breathing. In 15 seconds, Correctional Officer Ketulis came in to help cut Tristan down. Lieutenant Rizzardi immediately initiated CPR. Lieutenant Rizzardi did compressions while Correctional Officer Bloschichak gave breaths. They continued with CPR until the EMS workers got there (Exhibits 48, 49, NT 31-34; Exhibits, 25, 26, 27, 28).

30. Pottsville Area EMS was summoned at 1440 and arrived at 1442. On arrival, CPR was in progress by Correctional Officers. The emergency medical technicians instituted CPR and departed the prison at 1458, arriving at the Good Samaritan Regional Medical Center at 1501 (Exhibit 30).

31. In the Emergency Department, intensive ACLS cardiopulmonary resuscitation was continued. Tristan failed to respond to intensive ACLS cardiopulmonary resuscitation, expired, and was pronounced at 3:07 p.m.

32. In autopsy performed on November 7, 2007, Richard P. Bindie, M.D. determined the cause of death is attributed to hanging and manner of death is suicide.

## **DESIGN & CONSTRUCTION OF JAIL**

33. The County Prison (jail) was built in 1851 and is a historical site. With the exception of the outside wall and administrative/work release area, the prison was

7

redesigned and reconstructed in accordance with plans prepared by architects, Benatex Associates (Exhibit 43, ¶ 13).

    34.    The Pennsylvania Department of Corrections has inspected the jail annually and has never informed Schuylkill County that the design of the cell or design of the ventilation grates in the cells where Tristan was incarcerated on November 6, 2004, was deficient or proposed a suicide hazard (Exhibit 43, ¶ 14).

    35.    At the time of Resident Wargo's suicide, the prison was in the process of covering the ventilated grates with new covers of perforated steel with 3/8" sized air vent holes.  The initial installation was made in the holding cell and medical cell area, which was completed prior to Resident Wargo's suicide.  New vent covers were later installed in the RHU Restricted Housing Unit (E Block) and completed as of April 27, 2005.  The installation of ventilation covers for the remaining five housing units was completed on October 12, 2005 (Exhibit 48, ¶ 16).

## MANAGEMENT OF THE JAIL

    36.    The Schuylkill County Prison Board is responsible for the "safekeeping, discipline and employment of prisoners and government and management" of the jail. 61 P.S. § 408.

    37.    Acting Warden Berdanier is not and has never been a member of the Prison Board and is not entitled to vote at the Prison Board meetings.

    38.    The Prison Board is an independent legal entity.  ***Nonemacher v. County of York,*** 62 Pa. Cmwlth. 200-203 (Pa. Cmwlth. 1981).

    39.    The Prison Board acts by majority vote of its members.  61 P.S. § 409.

    40.    On November 6, 2004, the Prison Board was comprised of the Schuylkill County Commissioners, the Schuylkill County President Judge, the Schuylkill County Sheriff, the Schuylkill County District Attorney and the Schuylkill County Controller.

## JAIL POLICIES ESTABLISHED AT THE SCHUYLKILL COUNTY PRISON

    41.    Gerald Britton is the former Warden of Schuylkill County and has served in that capacity from July 25, 1999, to October 4, 2004, at which time he resigned to

accept employment as Executive Director at Conewago, Wernersville, a private correctional facility (Exhibit 42, ¶ 2).

42.  Upon assuming his duties as Warden at the Schuylkill County Prison on July 25, 1999, he commenced the establishment and implementation of prison policies, including suicide prevention and intervention policies and the establishment and implementation of a continuing education program for correctional staff to supplement training previously provided for suicide prevention and intervention, as follows:

> Offender Admission Procedure (Exhibit 1)
> Health Care Screening Procedures (Exhibit 2)
> Routine Screening Procedures (Exhibit 3)
> Suicide Prevention and Intervention Policy (Exhibit 4)
> Suicide Threats Policy (Exhibit 5)

Exhibit 43, ¶ 2

43.  Newly created policies were submitted to the Pennsylvania Department of Corrections for review (Exhibit 42, ¶ 3).

44.  The supplemental and ongoing training, in addition to that provided by the State Department of Corrections Training Academy at Elizabethtown, Pa., and provided by the Prison Staff (Exhibit 41) including training on mental illness and suicide intervention and prevention given on February 4, 2004.  A true and correct copy of the attendance sheet and training materials for the Course Series Mental Illness:  What Correctional Officers Need to Know is identified as Exhibit 11.

45.  During his tenure as Warden for Schuylkill County Prison, there were no prison suicides (Exhibit 42, ¶ 5).

46.  During his tenure as Warden of the Schuylkill County Prison from 1999 to 2004, the prison protocol was to have the prison psychiatrist, Dr. Pascal, make the determination to take an inmate off suicide watch (Exhibit 42, ¶ 6).

47.  Following his appointment as acting warden in October 2004, Acting Warden Berdanier continued the policies previously developed by former Warden Britton and training programs previously implemented by Warden Britton, including the suicide prevention and intervention policy and suicide threat policy (Exhibit 43).

48. The County of Schuylkill arranged a contract with Harold Pascal, M.D., to provide psychiatric services at the Schuylkill County Prison. Dr. Pascal testified that he was usually the one to take people off suicide watch at the prison (Deposition Harold Pascal, NT 22-23).

## **TRISTAN'S ALLEGED PROPENSITIES FOR SUICIDE**

49. On intake screening, Tristan Wargo denied that he had been hospitalized or recently been seen by a medical or psychiatric doctor for any reason (Exhibit 13).

50. On intake screening, Tristan Wargo denied taking any medication for a psychiatric disorder (Exhibit 13).

51. On intake screening, there was nothing in the inmate's behavior to suggest the risk of suicide (Exhibit 13).

52. On intake screening, Tristan Wargo did not express any suicidal threat or ideation (Exhibit 13).

53. In his meetings with Michael Kryjak, Tristan did not express any suicidal threat or ideation (Exhibits 22, 23).

54. When he met with Michael Kryjak on November 1, 2004, Tristan did not express any suicidal ideation (Exhibit 22).

55. When he met with Michael Kryjak on November 5, 2004, Tristan reported no psychiatric history; rather his major complaint has been a medical issue focusing on his back (Exhibit 23).

56. Plaintiff has no evidence to prove Tristan Wargo advised any personnel at the Schuylkill County Prison that he had a history of suicide attempt(s) (Exhibits 60, 61) (Plaintiff's Response to Request to Admission No. 2 – Admitted).

57. Plaintiff has no evidence to prove Tristan Wargo advised any personnel at the Schuylkill County Prison that he had a history of suicidal thoughts or ideations (Exhibit 60, 61) (Plaintiff's Response to Request for Admissions No. 3 – Admitted, as amended Exhibit 63).

58. At the time of commitment to the Schuylkill County Prison, Tristan denied that he had been recently hospitalized or recently been seen by a medical or psychiatric

10

doctor for any illness (Plaintiff's Response to Request for Admissions No. 5 – Admitted) (Exhibits 60, 61).

59.   For two years prior to his incarceration on October 28, 2004, Tristan had not been prescribed any medication for depression or any other mental health disease (Response to Request for Admission No. 10 – Admitted) (Exhibits 60, 61 and as revised, Exhibit 63).

60.   Plaintiff has no evidence to prove Tristan Wargo had attempted to harm himself from November 1, 2004, through November 5, 2004 (Response to Request for Admission No. 12 – Admitted) (Exhibits 60, 61).

61.   On November 3, 2004, Tristan had been given a regular prison uniform to wear (Response to Request for Admission No. 13 – Admitted) (Exhibits 60, 61 and as revised, Exhibit 63).

62.   On November 4, 2004, Tristan was removed from 15-minute observations and put on 3-minute observation (Response to Request for Admission No. 14 – Admitted) (Exhibits 60, 61).

63.   On November 4, 2004, Tristan was given a blanket (Response to Request for Admission No. 15 – Admitted) (Exhibits 60, 61).

64.   On November 5, 2004, Tristan was given a regular food tray (Response to Request for Admission No. 16– Admitted).

66.   Plaintiff has no evidence to prove Michael Kryjak knew of the incident with the mattress on October 30, 2004 (Response to Request for Admission No. 23 – Admitted with a caveat that Kryjak testified that he saw Tristan periodically in his cell when he passed by and would stop and have a few words with him.  Some of these occasions would have been after the mattress was removed from the cell on 10/30/04) (Exhibits 60, 61).

67.   Plaintiff has no evidence to prove Michael Kryjak knew of the staple incident on October 31, 2004 (Response to Request for Admission No. 24 – Admitted) (Exhibits 60, 61).

68.   No family member or friend of Tristan advised anyone of the Schuylkill County Prison that he/she had concerns for Tristan Wargo's mental health (Response to Request for Admission No. 30 – Admitted) (Exhibits 60, 61).

11

69.     No family member or friend of Tristan Wargo advised anyone at the Schuylkill County Prison that he/she had concerns that Tristan Wargo was suicidal (Response to Request for Admission No. 31 – Admitted subject to the testimony of Joseph Krawczyk which has not yet been taken (Exhibits 60, 61) (Deposition of Joseph Krawczyk, NT 42-43).

70.     When the deposition of Joseph Krawczyk was taken on February 28, 2008, Joseph Krawczyk testified that he did not tell anybody at the prison that Tristan looks suicidal or might hurt himself (Exhibit 66, NT 43, Lines 5-7).  Further, Joseph Krawczyk testified that he did not recognize Tristan as suicidal (NT 42, Lines 21-25l NT 43, Lines 1-2).

71.     At all times material to this action, the Schuylkill County Prison had a suicide policy set forth in Exhibits 1-5 (See also Exhibits 54, 65).

72.     On an annual basis, the Commonwealth of Pennsylvania, Department of Corrections inspects the prison reviews policies and procedures.

73.     Schuylkill County Prison provided suicide training and Lieutenant Flannery, Lieutenant Rizzardi and Michael Kryjak received suicide training (Exhibits 11, 38, 39, 40).  Lieutenant Rizzardi also took a suicide prevention training program in Georgia in January 2000 (Exhibit 49) (Deposition of Scott Rizzardi, NT 7-9).

74.     Training at the Schuylkill County Prison included the presentation of Serious Mental Illness "What Correctional Officers Need to Know" (Exhibit 11).

75.     Suicide training was also provided by Michael Kryjak (Exhibit 41).

76.     Michael Kryjak has a Bachelor's degree in Sociology and attended a three-year program at the American Psychiatric Institute and attended on-going mental health training at the Reading Hospital & Medical Center.  He completed 30 hours of instruction at the Pennsylvania Department of Corrections, Elizabethtown Training Academy on suicide prevention and was awarded a Certificate on November 1, 2002.  He completed the course in serious mental illness – What Correctional Officers Need to Know on February 11, 2004 (Exhibits 11, 38).

77.     Lieutenant Scott Rizzardi and Lieutenant Michael Flannery attended a training course in Serious Mental Illness – What Correctional Offices Need to Know on February 11, 2004 (Exhibits 11, 39, 40).

12

## **ROLL OF PRISON STAFF**

78.     Acting Warden Gene Berdanier had no contact or communication with Tristan during the period of his incarceration (Exhibit 43, ¶ 1).  On November 6, 2004, at approximately 1445, Lieutenant Rizzardi contacted Attorney Warden Berdanier at home with information that inmate Tristan Wargo attempted suicide by hanging (Exhibits 43, 25, 29).

79.     Lieutenant Michael Flannery, now Captain Michael Flannery's involvement was a dayshift supervisor.  Upon receipt of the October 30, 2004, 6:45 a.m. incident report, Lieutenant Flannery ordered Tristan to remain in the medical holding cell under close observation in a prison gown with 15 minute checks (Exhibit 17) until seen by the prison counselor on Monday, November 1, 2004 (Exhibits 46, 47).

80.     After November 1, 2004, privileges were gradually reinstated and no further incidents were reported, prior to the suicide of November 6, 2004 (Exhibit 16).

81.     The involvement of Lieutenant Rizzardi is as follows:  He was the shift lieutenant upon Tristan's commitment.  By reason of Tristan's self-report of anticipated withdrawal from Oxycontin, Lieutenant Rizzardi directed that Tristan be placed in a medical holding cell on regular prison issue with one-hour checks.  His next involvement with Tristan was on November 6, 2004, at 1432 p.m. while he discovered Tristan hanging in his cell, cut him down and initiated CPR (Exhibits 25, 48, 49).

82.     On November 5, 2004, Correctional Officer Stephen Bloschichak escorted Resident Wargo to E block and did the cell change.  He remembered asking Resident Wargo how he was doing and having small talk.  He specifically remembered that Resident Wargo was kind of excited to be going to the regular block because he would have phone privileges and he wouldn't be locked in his cell all the time (Exhibits 26, 50, 51).

83.     On November 6, 2004, Correctional Officer Bloschichak did the last check of the shift following lockdown at approximately 2:30 p.m.  At that time, Correctional Officer Bloschichak remembers seeing Resident Wargo standing by his cell either by the desk or by the top bunk (Exhibits 26, 50, 51).

84. Thereafter, Correctional Officer Bloschichak responded to Lieutenant Rizzardi's request for assistance and administered CPR breaths to Resident Wargo until the paramedics arrived (Exhibits 26, 50, 51).

85. Correctional Officer Patricia E. Heckman was in Control Room B with Resident Tristan Wargo occurred when Lieutenant Rizzardi made an "all guards" to all E-block. C/O Heckman opened the cell door and E-block door to permit rescue and resuscitation efforts. Previously, at the 7 a.m. check, she saw Resident Wargo lying on his bed as I delivered his breakfast tray. She had previously seen Resident Wargo in the medical holding cell and did not observe any behavior which caused her concern (Exhibits 52, 53).

86. Michael Kryjak, former prison counselor, now deceased, released Tristan from the medical holding cells to the general population based upon the following:

- ➢ Tristan did not express any suicidal ideation.
- ➢ There were no further behavioral incidents after October 31, 2004.
- ➢ At his interview with Tristan in November 5, 2004, there was no psychiatric history. His major complaint has been a medical issue involving his back.
- ➢ Tristan maintained eye contact.
- ➢ Counselor Kryjak placed Tristan in E-block which was the only general population unit with space. Counselor Kryjak explained that he did not consider putting Tristan with another inmate because he did not consider Tristan to be a suicide threat.

## **ROLE OF PRISON BOARD MEMBERS**

87. As Prison Board Members, Former District Attorney Cori and President Judge Baldwin, were not present at the Schuylkill County Prison when Tristan committed suicide or any time during the period from initial incarceration on October 28, 2004 through November 6, 2004.

88. Prison Board Member, Former District Attorney Cori and President Judge Baldwin, did not see Tristan during his incarceration, had no role in processing him, supervising or making any determination involving placement on close

observation/suicide watch and/or the determination to release Tristan to return to the general population.

89.     The Prison Board Chairman, former District Attorney Frank Cori, conducted interviews of prison personnel. No formal report or findings were issued.

## UNDISPUTED FACTS RELATING TO DAMAGE ISSUES

"43.    For at least two years prior to his incarceration at the Schuylkill County Prison, Tristan Wargo had not lived with the Plaintiff, Jean Wargo." **-- Admitted**.

(Exhibit 60-61; Request 43)

44.    For at least two years prior to his incarceration at the Schuylkill Count Prison, Tristan Wargo had not provided financial support for the Plaintiff, Jean Wargo." **-- Admitted.**

(Exhibit 60-61; Request 44)

45.    For at least two years prior to his incarceration at the Schuylkill County Prison, Tristan Wargo had not provided Plaintiff, Jean Wargo, with any assistance or household services." **-- Admitted**.

(Exhibit 60-61; Request 45)

## UNCONTROVERTED FACTS ON THE ISSUE OF DAMAGES – LOSS OF EARNINGS OR FUTURE EARNING CAPACITY

"33.   Since at least October 10, 2003, Tristan Wargo had not been employed." **-- Admitted**.

(Exhibit 60-61; Request 33).

"34.   On October 10, 2003, Tristan Wargo made application to the Social Security Administration for disability benefits." **-- Admitted**.

(Exhibit 60-61; Request 34).

"35. In pursuit of his application for benefits from the Social Security Administration, Tristan Wargo certified to the Social Security Administration that he was disabled rendering him unable to engage in any substantial gainful activity." **-- Admitted**.

(Exhibit 60-61; Request 35).

"36. In or about February 2004, the Social Security Administration had determined Tristan Wargo's application for disability benefits retroactive to the date of application, October 10, 2003." – **Admitted.**

(Exhibit 60-61; Request 36).

"37. In or about February 2004, the Social Security Administration approved Tristan Wargo's application for disability benefits retroactive to the date of application, October 10, 2003." **-- Admitted.**

(Exhibit 60-61; Request 37).

"38. Effective October 10, 2003, until the date of his incarceration in the Schuylkill County Prison on October 28, 2004, Tristan Wargo had received disability benefits from the Social Security Administration." **-- Admitted.**

(Exhibit 60-61; Request 38).

"39. In order to obtain cash benefits from the Social Security Administration, Tristan Wargo represented and proved he was not capable of engaging in competitive employment." **-- Admitted.**

(Exhibit 60-61; Request 39).

"40. As of October 28, 2004, Tristan Wargo had not made application to the Social Security Administration to continue his benefits for a Trial Work Period." **-- Admitted.**

(Exhibit 60-61; Request 40).

"41. As of October 28, 2004, Tristan Wargo had not advised the Social Security Administration that he had earned any income since the time he established entitlement to disability benefits in October 2003." **-- Admitted.**

(Exhibit 60-61; Request 41).

"42. Tristan Wargo had been incarcerated in the Luzerne County Juvenile Facility as a minor." **-- Admitted.**

(Exhibit 60-61; Request 42).

"47. As of October 28, 2004, Tristan Wargo had no planned or scheduled surgeries or other medical procedures intended to improve his back condition." **-- Admitted.**

(Exhibit 60-61; Request 47).

"48. Tristan Wargo dropped out of high school in the tenth grade." **-- Admitted.**

(Exhibit 60-61; Request 49).

**"**49. Subsequent to dropping out of high school, Tristan Wargo did not earn a GED." **-- Admitted.**

(Exhibit 60-61; Request 49).

"50. Subsequent to dropping out of high school, Tristan Wargo had not taken any college or vocational courses or obtained any vocational training." **-- Admitted.**

(Exhibit 60-61; Request 50).

      RESPECTFULLY SUBMITTED,

      **ZIMMERMAN, LIEBERMAN & TAMULONIS**

By:   /s/ Frank L. Tamulonis, Jr., Esquire
      Frank L. Tamulonis, Jr., Esquire
      Attorney I.D. #20808
      Attorneys for Schuylkill County Defendants

111 East Market Street
P. O. Box 238
Pottsville, Pennsylvania  17901

Telephone: 570-622-1988
Facsimile: 570-622-3261
Email: ftamulonis@comcast.net