# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEAN WARGO,** | : | **No. 3:06cv2156** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **SCHUYLKILL COUNTY;** | : | |
| **GENE BERDANIER, Acting Warden,** | : | |
| **Schuylkill County Prison;** | : | |
| **FRANK CORI, Schuylkill County** | : | |
| **District Attorney;** | : | |
| **WILLIAM BALDWIN, President** | : | |
| **Judge Schuylkill County;** | : | |
| **MICHAEL KRYJAKp;** | : | |
| **LT. M. FLANNERY; and** | : | |
| **LT. RIZZARDI,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court are defendants' motions for summary judgment in this case. Having been fully briefed and argued, the matter is ripe for disposition.

**Background**

This case arises from the death of Tristan Wargo.  Wargo committed suicide while incarcerated in the Schuylkill County Prison ("SCP") on November 6, 2004. (Corrected Statement of Material Facts in Support of Motion for Summary Judgment on Behalf of Schuylkill County Defendants (Doc. 55) (hereinafter "County Defendants' Statement") at ¶ 1).

The plaintiff in this case is Jean Wargo, who was Tristan Wargo's

grandmother and is the administratrix of his estate.  (Id. at ¶ 4(a)).  Jean Wargo was

not aware that her grandson had previously attempted suicide.  (Id. at ¶ 4(c)).

Tristan Wargo never spoke to his grandmother about any emotional problems.  (Id.).

Tristan spoke to Jean two or three times while he was in prison.  (Id. at ¶ 4(d)).  He

asked her to have his father visit him in prison.  (Id.).  Two days before he killed

himself, Tristan called to ask his grandmother to put up bail for him.  (Id.).  She

refused.  (Id.).  Tristan did not reveal to his grandmother that he was having any

problems in prison, but simply asked her to help him get out.  (Id.).

The defendants who remain in the case are: Schuylkill County; Gene

Berdanier, acting warden of the prison since December 2004; Frank Cori, former

chairman of the Schuykill County Prison Board ("Board"); Hon. William E. Baldwin,

President Judge of Schuylkill County and Prison Board member; Michael Kryjak,

former prison counselor, who is now deceased; Lt. Michael Flannery, a prison

supervisor at the time of the incident; Lt. Rizzardi, a prison officer who placed Tristan

in the cell where he died and was responsible for checking him every hour before he

died.  (Id. at ¶ 5(a-g)).

Tristan Wargo was in jail because on October 28, 2004 he had used a

shotgun to rob the The Standard Drugstore in McAdoo, Pennsylvania.  (Id. at ¶ 4(d)).

He stole around $7,000.  (Id.).  Plaintiff points out that Tristan Wargo started using

Oxycontin to treat a back injury.  (Plaintiff's Counterstatement of Material Facts (Doc.

62-2) (hereinafter "Plaintiff's Statement" at ¶ 1-2).  Once cut off from his prescribed

medication, Wargo began to steal from the pharmacy that had previously filled his prescription.  (Id. at ¶ 3).  Arrest on those charges landed Tristan Wargo in the Schuylkill County Prison.  (Id. at ¶ 4).  He had never been arrested before the events that led to his death.  (Id. at ¶ 5).

After his arrest on October 28, 2004, Police Chief John Petrilla transported Wargo to court, where the judge set bail at $50,000 straight cash.  (Id. at ¶ 8).  Petrilla then took Wargo to the SCP.  (Id.).  During this entire period, Wargo expressed remorse for his actions, but did not make any threats to harm himself or express any suicidal thoughts.  (Id.).

Tristan Wargo arrived at the prison around 7:45 p.m.  (Plaintiff's Statement at ¶ 7).  Correctional Officers Wowak and Murton booked him when he arrived. (County Defendant's Statement at ¶ 9).  The officers did not notice any risks of suicidal behavior, but denied that he had been hospitalized recently or seen by any psychiatric doctor.  (Id. at ¶¶ 10-11).  Wargo disclosed heart and back problems to the officers.  (Id. at ¶ 12).  He reported that he was prescribed medication for these problems.  (Id. at ¶ 13).  The officers noticed that Wargo appeared to be experiencing withdrawal symptoms.  (Id.).  Once these conditions were noticed, officers placed Wargo in a medical holding cell and ordered a check every hour.  (Id. at ¶ 15).  Once informed by plaintiff of his likely withdrawal from Oxycontin, Lt. Rizzardi ordered Wargo placed in a medical holding cell and ordered one-hour checks.  (Id.).  Plaintiff contends that these checks were not performed as directed,

but were limited only to "cursory hourly checks." (Plaintiff's Statement at ¶ 25).

Wargo underwent a medical evaluation at the prison on October 28, 2004. (Defendant's Statement at ¶ 16). He reported that he had an allergy to the anti-depressant Wellbutrin. (Id.). He listed his current medications as Oxycontin, Neurontin, Skelaxin and Spirazide. (Id.). Wargo told doctors that he had taken Oxycontin for 2 ½ years, that he had a hole in his heart, arrythmia, congenital heart disease and 5 ruptured discs in his back. (Id.). He reported that he only took Oxycontin per prescription. (Id.). A physical exam revealed plaintiff was within normal limits. (Id.).

Early in the morning on October 30, 2004, Wargo told correctional staff that he had taken 10-12 Oxycontin tablets that he had smuggled into the jail in his rectum. (Id. at ¶ 17). Though Lt. Flannery went to the cell to examine Wargo and found nothing visibly wrong with him, he nevertheless ordered that Wargo be placed in a holding cell, kept under observation and dressed in a special clothing (a "gown") designed to minimize the risk of suicide. (Id. at ¶ 18). Flannery also ordered checks every fifteen minutes. (Id.). Wargo never told any prison officials that he had taken the drugs in an attempt to commit suicide. (Statement of Undisputed Facts in Support of Motion for Summary Judgment on Behalf of Defendant Michael Kryjak (Doc. 58-3) (hereinafter "Kryjak Statement") at ¶ 17). The prison counselor who saw Wargo after these incidents, Defendant Michael Kryjak, considered Wargo's behavior typical of a drug addict and not evidence of an intent to commit suicide. (Id.

at ¶ 20).

Correctional Officers reported two incidents involving Tristan Wargo over the next few days.  On October 30, 2004, an officer filed an incident report relating that Wargo had removed the thread from his mattress.  (Defendants' Statement at ¶ 19). The officer removed the thread from the inmate, as well as the mattress.  (Id.).  Lt. Flannery maintained the order that plaintiff wear a gown and be subjected to fifteen-minute checks after this incident.  (Id.).  On October 31, 2004, another correctional officer filed a report that indicated Wargo had complained that something was in his eye.  (Id. at ¶ 21).  The officer noted that a staple appeared to be sticking out of Wargo's eye.  (Id.).  Lt. Flannery investigated, discovered the staple, and pulled it out.  (Id.).  The staple apparently served to keep open a piercing in Wargo's eyebrow.  (Id.).  Officers reported no other incidents involving Wargo's behavior.  (Id. at ¶ 24).  Lt. Flannery testified that he had never placed Wargo on suicide watch and did not consider the reported incidents evidence of Wargo's desire to harm himself. (Id. at ¶ 22).  Plaintiff contends that the level of observation and restriction ordered by Flannery are the equivalent of a suicide watch.  (Plaintiff's Statement at ¶ 14).

Defendant Michael Kryjak, a prison counselor, met with Tristan Wargo on November 1, 2004.[1]  (County Defendants' Statement at ¶ 23).  Kryjak reported that Wargo had not expressed any desire to commit suicide.  (Id.).  No other prison personnel reported that Wargo had expressed any suicidal thoughts.  (Kryjak's

---

[1]Kryjak is now deceased.

Statement at ¶ 29).  He also testified that he was not aware of plaintiff's destruction of his mattress or other "incidents" while incarcerated.  (Id. at ¶¶ 38, 43-44). Nevertheless, Kryjak recommended that Wargo's behavior while in jail and his obvious "issues" with prescription drug use required that observation of him be maintained.  (Defendants' Statement at ¶ 23).  Kryjak testified at his deposition that he had other contact with Wargo, periodically visiting him at his cell and speaking with him.  (Kryjak's Statement at ¶ 23).  He recommended observation of Wargo because Wargo was not complying with guard's orders, was a drug addict, had smuggled drugs into the jail, and had reported that he spit up dark blood.  (Id. at ¶ 26).

Defendants increased Wargo's privileges during his days in the prison as his behavior improved.  (Defendants' Statement at ¶ 24).  The prison provided Wargo with a uniform on November 3, 2004.  On November 4, 2004, the prison ordered that checks of Wargo be reduced to every 30 minutes.  (Id.).  The prison also gave him a blanket on that day.  (Id.).  The next day, the prison allowed Wargo to eat his food off a tray and use plastic utensils.  (Id.).

Wargo met again with Kryjak on November 5, 2004.  (Id. at ¶ 25).  Kryjak reported that Wargo had not mentioned any psychiatric history, but instead complained about back problems.  (Id.).  This back injury led Wargo to begin abusing prescription pain medication.  (Id.).  After the conversation, Kryjak recommended that Wargo be placed in the general population.  (Id.).  Because of

overcrowding, Wargo agreed that he should be placed in "E-block." (Id.).  In, E-block, prisoner are isolated in their cells 23 hours a day and guards cannot see into the cells on the Block.  (Plaintiff's Statement at ¶ 34).

The prison transferred Wargo to E-Block and placed him in a single cell on November 5, 2004.  (Defendants' Statement at ¶ 26).  The next day, Correctional Officer Stephen Bloschichak performed a check at 12:25 p.m.  (Id. at ¶ 27).  Bloschichak recalls that at the time of the check he saw Wargo standing in his cell, either next to the desk or the top bunk.  (Id.).  Lt. Rizzardi, making rounds to deliver medication, discovered Wargo hanging from a sheet in his cell at 12:35 p.m.  (Id. at ¶ 28).  Rizzardi radioed for assistance from other guards.  (Id. at 29).  He ran into the cell and tried to hold Wargo up to reduce the pressure on his neck.  (Id.).  Wargo seemed still to be breathing.  (Id.).  Within 15 seconds, another correctional officer came into the cell and helped cut Wargo down.  (Id.).  Wargo and Rizzardi combined to give Wargo CPR until emergency medical technicians arrived at the cell.  (Id.).  The EMTs continued to provide CPR until they left the prison with Wargo at 2:58.  (Id. at ¶ 30).  They transferred Wargo to Good Samaratin Regional Medical Center, where he was pronounced dead at 3:07 p.m.  (Id. at ¶ 31).  An autopsy performed the next day declared suicide as the cause of death.  (Id. at ¶ 32).  Investigators found a suicide note in Tristan Wargo's cell, which stated that "I have passed up the opportunity to kill myself too many times but I'm not going to do it this time.  Suicide was always the plan . . . I have been trying to kill myself since I got into this place but

now I have a REAL way to do it." (Plaintiff's Statement at ¶ 38).

Plaintiff Jean Wargo filed a complaint in this court on November 2, 2006 (Doc. 1). The complaint raises four counts. Count I, brought pursuant to 42 U.S.C. § 1983, alleges deliberate indifference to Wargo's serious medical needs in violation of the Fourth and Fourteenth Amendments. The count contends that defendants, despite knowledge of Wargo's past, drug addiction problems, and attempts to harm himself in prison, did nothing to attempt to prevent him from taking his own life. Count II, also brought pursuant to 42 U.S.C. § 1983, alleges a violation of plaintiff's First and Fourteenth Amendment rights through the pattern, practice and policy of the County and members of the prison board. Count III, brought pursuant to the Wrongful Death Act (presumably under Pennsylvania law), alleges damages for the plaintiff related to that death. Count IV seeks damages under the Pennsylvania Survival Act.

The parties engaged in discovery. They eventually agreed to dismiss certain of the original defendants. At the close of discovery, the remaining defendants filed motions for summary judgment (Docs. 52, 58). The parties then briefed the issues, bringing the case to its present posture.

**Jurisdiction**

As plaintiff brings her claims pursuant to 42 U.S.C. § 1983, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the

United States.").  The court has supplemental jurisdiction over plaintiff's state-law

claim pursuant to 28 U.S.C. § 1367(a) ("In any civil action of which the district courts

have original jurisdiction, the district courts shall have supplemental jurisdiction over

all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article II of the

United States Constitution.").

**Legal Standard**

        The defendants have filed motions for summary judgment.  Granting summary

judgment is proper if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED.

R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of

material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

(emphasis in original).

         In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion.  International Raw

Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The

burden is on the moving party to demonstrate that the evidence is such that a

9

reasonable jury could not return a verdict for the non-moving party.  <u>Anderson</u>, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law.  <u>Id.</u>  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial.  <u>Celotex v.</u>

<u>Catrett</u>, 477 U.S. 317, 322 (1986).

**Discussion**

The defendants, in separate motions by Defendant Kryjak (Doc. 58) and the

other defendants (the "County Defendants") (Doc. 52) raise several grounds for

granting summary judgment.  The court will address them in turn, as appropriate.

### i.  Section 1983/Prison Suicide

Plaintiff contends that defendants should be liable for violating Tristan Wargo's

rights by not preventing his suicide.  A plaintiff seeking to prevail on a prison suicide

claim pursuant to Section 1983 must establish three elements: (1) that the detainee

had a "particular vulnerability to suicide"; (2) the custodial officer or officers knew or

should have known of that vulnerability; and (3) those officers "acted with reckless

indifference" to the detainee's particular vulnerability.  To create liability, "the risk of

self-inflicted injury must not only be great, but also sufficiently apparent that a lay

custodian's failure to appreciate it evidences an absence of any concern for the

welfare of his or her charges."  <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 320

(3d Cir. 2005). Liability cannot lie for negligence; the risk of self-inflicted harm must be obvious. The burden for proving liability in a prison suicide case is a difficult one to meet, since "a prison custodian is not the guarantor of a prisoner's safety. We cannot infer from the prisoner's act of suicide itself that the prison officials were recklessly indifferent in their obligation to a take reasonable precautions to protect the safety of prisoners entrusted to their care." Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988).

The defendants argue that the evidence does not demonstrate that plaintiff had any particular vulnerability to suicide before he killed himself on November 6, 2004. To establish that the decedent represented a "particular vulnerability to suicide, the plaintiff must demonstrate "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" Wolosyzn, 396 F.3d at 320. Defendants point to a number of facts that demonstrate that plaintiff did not have a particular and noticeable vulnerability to suicide.[2]

---

[2]The facts cited by the defendants include:
> The arresting officer did not observe any suicidal threats, ideation or behavior;
> Wargo made no attempt to harm himself during tranport to prison, and did not express a desire to do so;
> The Chief of Police who transported Wargo to prison did not warn guards that Wargo suffered from suicidal tendencies;
> Wargo did not manifest any desire to harm himself or express any suicidal thoughts when he was processed into the prison;
> Officers did not ignore a self-report of drug addiction and ordered that Wargo be placed under observation for that condition;
> Officers did not consider Wargo's disruptive behavior as evidence of a suicidal intent;
> Pulling thread out of prison mattresses, as Wargo did, was a common

Here, the plaintiff apparently contends that Wargo's past psychiatric history, drug addiction and relative youth points to a particular vulnerability to suicide. Evidence indicates that in late 2000, almost five years before his arrest, Wargo was admitted to a psychiatric hospital. (See Discharge Summary (Doc. 63-2) attached as an Exh. P2 to Plaintiff's Exhibits to Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 63)). He complained of sexual abuse, severe depression and a desire to kill himself. (Id.). No other evidence in the record, however, indicates that this condition persisted at the time he was arrested. In addition, people who knew Wargo well and spoke with him while he was incarcerated reported that they did not consider him likely to harm himself. Wargo's grandmother, the plaintiff in this action, testified that she spoke to the decedent two or three times by telephone while he was in prison. (See Deposition of Jean Wargo, Exh. 59 to County Defendants' Motion for Summary Judgment (Doc. 52-57) at 31). In their conversations, Wargo asked his grandmother to "tell his father to come and see him" and inquired about when that visit would occur. (Id.). He also asked his

---

practice among inmates. They pulled the mattresses apart and crawled inside to get warm;

Pulling the staple out of Wargo's eye came at his request. Officers determined that it had been used to keep an eyebrow piercing open. Officers did not consider this a suicide attempt;

When interviewed, Wargo complained of medical issues, but never reported a desire to kill himself;

Observation of Wargo and reports thereof did not reveal any suicidal behavior until he killed himself; and

No member of Wargo's family ever advised defendants of a history of suicide attempts.

grandmother to help him make bail by pledging her home as security.  (Id.).  Despite

his desire for release, Wargo did not report "any problems in jail" to his grandmother;

"he just wanted out."  (Id. at 32).

     Joseph H. Krawczyk, who visited Wargo several times in prison, reported that

he had not suspected that Tristan would commit suicide.  (Deposition of Joseph

Krawczyk, Exh. 2 to Michael Kryjak's Motion for Summary Judgment (hereinafter

"Krawcyzk Dep.") (Doc. 58-5) at 42).   Krawcyzk had known Wargo for around two

years, and considered himself "like his uncle."  (Id. at 6).  "Anytime he had a problem

he talked to [Krawczyk's] daughter, come up and visit, hung out.  It was like having

another son.  Talked to me about anything he wanted."  (Id.).   Though Wargo

"looked like he was death warmed over, like he was hurting," Krawczyk did not see

Tristan as "somebody I knew who would do it.  I didn't think he would do it but, you

know, he could have been."  (Id. at 42).  He saw Wargo "in pain," but did not tell

anyone at the prison that he had the potential to harm himself.  (Id. at 43). Only in

retrospect did he think that he should have warned guards.  (Id.).  On Krawcyzk's

final visit to the prison, guards informed him that Wargo had committed suicide.  (Id.

at 44).  He called the guard a "liar" and demanded proof that Wargo had really killed

himself.  (Id.).

     The court finds that the evidence is not sufficient to establish that Wargo

represented a particular vulnerability to suicide when he arrived at prison, particularly

in light of the fact that none of Wargo's behavior during his arrest, transport to

prison, and initial interviews indicated that he had a desire to harm himself.  In addition, none of Wargo's family members or friends reported that they suspected he would harm himself after his arrest.  Krawcyzk, who claimed to be as close an uncle to the decedent, at first refused to believe that Wargo had killed himself.  He had not seen any reason to suspect that suicide was imminent.  Courts have found a lack of a particular vulnerability to suicide in cases where an inmate denies suicidal ideation and family members report that they did not suspect such activity would occur.  See, e.g., Herman v. County of York, 482 F. Supp. 2d 554, 565 (M.D. Pa. 2007) (finding that "in the face of [decedent's] repeated denials of suicidal ideation and, indeed, his own family's testimony that they did not suspect that he was suicidal . . . we see no reason that their decision not to place [decedent] on suicide watch would fall outside of their professional judgment.).   Schuenemann v. United States, No. 05-2565, 2006 WL 408404, *3 (3d Cir. Feb. 23, 2006) (finding no particular vulnerability to suicide when "ten witnesses, including [decedent's] close family members, observed him . . . [over a period of days and] [n]one of those individuals claimed that [decedent] was acting abnormally or that he gave any indication that he was going to inflict harm upon himself.").

Plaintiff also points to evidence from expert sources that indicates that persons exhibiting Wargo's characteristics–young, first time offenders with drug problems–are more likely to commit suicide than other inmates.  (See Timothy E. Ring, Ed.D., Consultation Report in the United States District Court for the

14

MIDDLE DISTRICT OF PENNSYLVANIA, Included as Exh. P21 to Plaintiff's Statement

(Doc. 63-2) (hereinafter "Ring Report")).   Plaintiff's expert argues that Wargo

reported to the prison with "a variety of significant risk factors for suicidality."  (Id. at

3).  Dr. Ring points to Wargo's youth, the severity of the crime he had committed and

his awareness of it, his addiction to Oxycontin and his likely withdrawal from the drug

as factors that made him likely to commit suicide.  (Id. at 4-7).  Plaintiff contends that

such information indicates that Wargo represented a particular vulnerability to

suicide.  The court is not convinced, because case law requires that the evidence

establish that the particular individual, not members of a demographic class to which

the individual belongs, exhibits a particular vulnerability to suicide.  See, e.g., Joines

v. Twp. of Ridley, 229 Fed. Appx. 161, 164 (3d Cir. 2007) (finding that a young,

intoxicated and apparently irrational prisoner did not suffer from a particular

vulnerability to suicide, even though an expert identified those characteristics as

representing a heightened risk, because decedent's "behavior in no way

demonstrated that he was inclined toward self-inflicted harm.").[3]  Plaintiff has

produced no evidence that Wargo himself represented the suicide risk that would

create liability for the prison, and the court cannot ascribe to him a particular

vulnerability based on broad social and demographic characteristics.

Moreover, even if the court were to conclude that Tristan Wargo suffered from

---

[3]The court recognizes that Joines, as an unpublished opinion, does not have
precedential value.  The court nevertheless finds the reasoning used in the case
persuasive and cites the case for that reason.

a particular vulnerability to suicide, the evidence does not establish that defendants knew or should have known of that vulnerability.  To establish that the defendants knew or should have known of Wargo's particular vulnerability, plaintiff must advance evidence that "[t]he 'strong likelihood' of suicide [was] 'so obvious that a lay person would easily recognize the necessity for' preventative action [and] the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."  Colburn, 946 F.2d at 1025.

The evidence establishes that prison officials were aware of Wargo's reported drug addiction and potential withdrawal and acted to prevent problems related to that condition when Wargo reported to the prison.  Such evidence does not establish, however, that defendants knew or should have know of a particular vulnerability to suicide on the decedent's part.  Instead, that evidence establishes that defendants knew decedent was a drug addict; such knowledge does not make defendants aware that plaintiff was likely to commit suicide.  Plaintiff argues that other information possessed by the defendants should have made them aware that Wargo was a danger to himself.  She points to three incidents she contends should have made the defendants aware of Tristan Wargo's particular vulnerability to suicide: his alleged ingestion of 10-12 Oxycontin Tablets; his pulling of threads from his mattress; and a staple that may have become lodged in his eye.

A review of each of the individual defendants' contact with the decedent

reveals that these incidents did not evidence a likelihood of suicide so obvious that the defendants lacked any concern for Wargo's welfare by failing to notice it.[4]  Lt. Rizzardi was not aware of any of these three incidents; instead, Rizzardi helped process Wargo when he entered te prison.  He testified that when Tristan Wargo first arrived he was "quiet" and not "rowdy," but was simply "polite" and willing to "answer [his] questions."  (Deposition of Scott Rizzardi, Unnumbered Exh. to Plaintiff's Brief in Opposition, (Doc. 63-4) (hereinafter "Rizzardi Dep.") at 52).  Wargo told Rizzardi during his intake that he would be suffering from Oxycontin withdrawal.  (Id. at 22). Armed with this information, Rizzardi assigned the decedent to a holding cell.  (Id. at 23). Wargo did not inform Rizzardi of any suicidal ideation, and Rizzardi testified that Wargo's placement in a holding cell was based solely on a desire to spare Wargo the conflict with other inmates that could come during withdrawal.  (Id.).[5]  As such,

---

[4]Only the three individual defendants discussed here had any contact with the decedent between the time he entered the prison and his suicide.  None of the other individual defendants had any such contact.

[5]The parties agree that Lt. Rizzardi cannot be liable.  The court also agrees with the defendants that summary judgment should be granted to Defendants Berdanier, Cori and Baldwin because plaintiff adduced no evidence that establishes they could be liable in their individual capacities, but only as the makers of policy that plaintiff contends violated Wargo's rights.  Since "'[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity,'" the court finds that the claims against "the defendant officials in their official capacities are only a duplication of the counts asserted against the Township itself."  Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988) (quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n.55 (1978); Kentucky v. Graham, 473 U.S. 159, 166 (1985)).  As such, those defendants would be dismissed from the case regardless of the court's decision on liability against the County and Defendants Flannery and Kryjak.

17

Rizzardi did not possess any evidence that Wargo intended to harm himself; he cannot be liable based on these facts.

Defendant Flannery, in his capacity as supervising Lieutenant, was made aware of each of these incidents.   Flannery heard from an incident report that Wargo claimed to have ingested 10-12 Oxycontin pills.  (Deposition of Michael Flannery, Unnumbered Exh. to Plaintiff's Brief in Opposition (Doc. 63-6) (hereinafter "Flannery Dep.") at 18).  After speaking with him and finding him normal, Flannery placed him in a cell in a gown and ordered 15 minute checks.[6]  (Id. at 29-30).  Flannery found Wargo "talking normally, he was not like–you know, anything out of the ordinary." (Id. at 21).  Wargo did not explain to Flannery when he had taken the

---

[6]The parties disagree about whether placing Wargo in a gown and ordering frequent checks should be considered placing him on suicide watch. Defendants contend that such orders amounted only to closer observation, and did not indicate that they considered Wargo likely to attempt suicide.  Plaintiff contends that the prison placed Wargo on suicide watch, as evidenced by these actions.  Plaintiff's complaint, however, is not that the prison placed Wargo in a gown and ordered frequent checks, but that officials took him off these restrictions after several days and placed him a setting where he would be able to harm himself.  The evidence indicates that Wargo did not exhibit any additional disruptive or potentially suicidal behavior after the last of the three incidents in question occurred on October 31 and he was released to the cell where he killed himself on November 6.   Even if a juror were to conclude that Wargo had exhibited a desire to harm himself during the three incidents in question, that juror would also have to find that a reasonable person would not conclude that "[t]he 'strong likelihood' of suicide [was] 'so obvious that a lay person would easily recognize the necessity for' preventative action [and] the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Colburn, 946 F.2d at 1025.  Nothing in Wargo's behavior signaled that careful watch remained necessary.  He had not expressed a desire to harm himself in the intervening days, and did not appear withdrawn or extraordinarily depressed.  Allowing Wargo access to more normal prison conditions after he exhibited normal behavior could not be considered display of "an absence of any concern for [his] welfare."  Id.  The prison cannot be expected to keep a close watch on an inmate who no longer displays a need for that watch.

drugs, or why he took them, and Flannery was unsure whether Wargo was "really being straightforward with" him.  (Id. at 26).  Flannery also received a report that Wargo had pulled a handful of string from his mattress.  (Id. at 35).  He testified that he did not take any action to determine why Wargo had done so "[b]ecause basically we have had this done before."  (Id. at 36).  Other inmates had "opened" up mattresses "because they were cold and [wanted to] crawl inside."  (Id. at 38).  Flannery had never heard of an inmate harming himself with materials from the mattress.  (Id. at 43).  Flannery also removed the staple that had been lodged in plaintiff's eye or eyebrow.[7]  Flannery testified that he did not call the medical department to remove the staple because prisoners frequently used staples "[t]o keep piercing holes open, ears, eyes, nose.  Try anything they will."  (Id. at 46).  Wargo's use of the staple therefore did not concern Flannery.  (Id.).  Flannery spoke with Wargo while removing the staple and found his demeanor had not changed from their earlier encounters.  (Id. at 60).  Flannery did not regard any of these incidents as evidence that Wargo intended to harm himself.  (Id. at 58).

Defendant Kryjak interviewed Wargo after he claimed to have ingested 10-12

---

[7]The parties dispute where the staple was when Flannery removed it.  Flannery in his testimony insisted that he removed the staple from Wargo's eyebrow.  The incident report, however, related that the staple was in his eye itself.  (Flannery Dep. at 44-47).  In any case, the fact that Wargo did not accompany the reports of the staple in or near his eye with any other unusual behavior, acted calmly when Flannery came to remove it, and did not tell anyone that he intended to harm himself is evidence that a reasonable person would not have seen such behavior as evidence of an obvious likelihood of suicide.  Moreover, in Flannery's experience inmates frequently used staples to keep piercings open, and thus he did not have reason to assume that Wargo's use of a staple was an attempt to inflict harm on himself.

Oxycontin tablets.  (Deposition of Michael Kryjak, Unnumbered Exh. to Plaintiff's Brief in Opposition  (Doc. 63-12) (hereinafter "Kryjak Dep.") at 46).  Kryjak considered Wargo's action in taking the drugs "abnormal," but not suicidal.  (Id. at 48).  In his experience, addicted prisoners often attempted to smuggle drugs into jail. (Id. at 48-49).  He was unaware whether 10-12 tablets was an excessive amount of Oxycontin to consume.  (Id.).  Wargo had told Kryjak that he was addicted to the drugs and likely to go through withdrawal, but Kryjak did not believe that Wargo's withdrawal would necessarily make him suicidal.  (Id. at 49).  Kryjak was not aware of the other two incidents.  (Id. at 61-62).

Kryjak spoke with Wargo several times between November 1 and November 5, 2005.  (Id. at 67).  Kryjak prepared a report of his November 1, 2005 meeting with Wargo.  (Incident Report prepared November 1, 2004, Exh. P15 to Plaintiff's Brief in Opposition (Doc. 63-2)).  According to Kryjak, Wargo "did not express any suicidal ideation."  (Id.).  Still, Kryjak recommended that Wargo remain under observation "due to his actions here at S.C.P. as well as resident's issues with prescription pain killers."  (Id.).  Wargo complained that "the confinement was making him crazy," and that he desired release from the holding cell.  (Id. at 68).  Kryjak reported that by November 5, 2005, "Tristan became a very pleasant compliant individual."  (Kryjak Dep. at 72).  Kryjak made the decision to move Wargo out of his holding cell and to give him prison clothing, sheets and a blanket.  (Id. 76, 106).  In recommending that release, Kryjak reported that Wargo denied any "psychiatric history" and complained

20

mostly of back problems that had led to an addiction to prescription pain pills. (Incident Report Exh. 23 to County Defendants' Motion for Summary Judgment (Doc. 52-26)).  Concluding that Wargo had "no reported psychiatric history and no medical issues, Kryjak recommended his placement in the general population."  (Id.). Wargo agreed to the recommendation.  (Id.).

The court finds that this evidence does not establish that these defendants knew or should have known that Wargo had a particular vulnerability to suicide. Wargo never expressed to anyone a desire to kill himself after his arrest, and all the evidence indicates that he behaved calmly and rationally in his interactions with guards and other prison personnel.  None of the facts here adduced–that Wargo may have ingested numerous Oxycontin tablets but did not display any unusual behavior after doing so, that he ripped threads from his mattress but did not attempt in any way to harm himself with them, and that he had a staple somewhere in or near his eye that an officer had to remove–would have made Wargo's intentions "so obvious that a lay person would easily recognize the necessity for preventative action."  Colburn, 946 F.2d at 1025.

Plaintiff also contends that the defendants should have been aware of decedent's past history of psychiatric treatment and history of depression, and this awareness should have alerted them to a particular vulnerability to suicide on Wargo's part.  The Third Circuit Court of Appeals has noted that "[c]ustodians have been found to 'know' of a particular vulnerability to suicide when they have had

21

actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Colburn, 946 F.2d at 1025 n.1.  No evidence, however, indicates that the defendants were aware of Wargo's history of psychiatric treatment when he arrived at the prison.  Instead, the evidence shows that Wargo denied to guards and counselors that he had a psychiatric history.  Instead, he informed them that he had a drug addiction and would probably face withdrawal symptoms.  Reports also indicate that Wargo's behavior was normal when he arrived at the prison and that he conversed with guards in a normal fashion.  As such, defendants neither knew or should have known of Wargo's past history of severe depression and suicidal ideation.

Plaintiff's argument that Wargo's reported allergy to Wellbutrin should have put defendants on notice of Wargo's potential mental health problems is similarly unavailing.  Even assuming that defendants should have recognized Wellbutrin as an anti-depressant, no evidence indicates that Wargo informed the guards when he had last taken Wellbutrin or that he still had a prescription for any anti-depressant.  In any case, the question this matter is whether defendants knew or should have known of a particular vulnerability to suicide.  Mere knowledge that a prisoner was at some unspecified point in the past prescribed an anti-depressant, without more, does not put anyone on notice of a particular vulnerability to suicide.  Millions of Americans take anti-depressant medication, and no rational lay-person would

assume that all of those people are likely to commit suicide.[8]  Indeed, the training

that the defendants received about depression emphasized that "[h]ow long

someone must take a psychotherapeutic medication depends on the disorder.  Many

depressed and anxious people may need medication for a single period–perhaps for

several months–and then never have to take it again."  (Training: FTAC's Serious

Mental Illness: What Corrections Officers Need to Know, Exh. 11 to County

Defendants' Motion (Doc. 52-14) at 42).

The facts in this case are like those in <u>Colburn v. Upper Darby Township</u>, 946

F.2d 1017 (3d Cir. 1991).  In <u>Colburn</u>, the Court of Appeals found that the trial court

had properly granted summary judgment to a jail guard who had searched the

decedent.  The guard knew that the decedent "was intoxicated, she had an

argument with her boyfriend, she had tried to ingest three pills, and a bullet had been

found and removed from her pocket."  <u>Id.</u> at 1026.  A post-mortem examination had

also revealed faint scars that could have come from a previous suicide attempt

---

[8]The Center for Disease Control and Prevention (CDC) has reported that in 2002 more than 5 percent of American men and more than 10 percent of American women reported that they had used an anti-depressant drug in the previous month. Center for Disease Control and Prevention, HEALTH, UNITED STATES, 2007 WITH CHARTBOOK ON TRENDS IN THE HEALTH OF AMERICANS, at 88, available at http://www.cdc.gov/nchs/data/hus/hus07.pdf#fig36.  Thus, many Americans have or will suffer from depression at some point in their lives, and use pharmaceuticals to treat the condition.  The suicide rate in the United States in 2005 was 11.01 deaths per 100,000 population. Center for Disease Control and Prevention, SUICIDE FACT SHEET, SUMMER 2008, available at www.cdc.gov/ncipc/dvp/suicide/suicide_data_sheet.pdf.  The rate of anti-depressant use therefore far exceeds the rate of suicide.  Accordingly, the fact that a person at one time took an anti-depressant to which he was allergic would perhaps make a prison guard aware that an inmate faced depression sometime in his past, but would not put anyone on notice that the person was likely to commit suicide.

"years earlier." Id.  No one at the jail had noticed these scars. Id.  The decedent had never been diagnosed with "a mental illness characterized by a high risk of self-inflicted harm." Id.  No evidence suggested that the defendant "was or should have been aware of anything else in [decedent's] past suggesting that she had a particular vulnerability to suicide." Id.  Similarly, in Freedman v. City of Allentown, the court found that granting a motion to dismiss plaintiff's prison-suicide-related case was proper.   The police officers who supervised and processed the decedent had not been informed of his suicidal tendencies. Freedman, 853 F.2d at 1116.  Still, decedent had "large, prominent scars on his wrists, inside of his elbows and neck" and the defendants had observed them. Id.  Failing to recognize such scars as evidence of suicidal tendencies, however, "amount[ed] only to negligence" and could not give rise to a Section 1983 claim. Id.  Here, Wargo had a past history of suicidal thoughts of which he never made the defendants aware.  No one at the prison knew of his past psychiatric treatment, and no one in Wargo's family warned guards of his past condition.  Wargo allegedly took drugs while in prison, though the drugs did not change his behavior and were not accompanied by any claims of a desire to harm himself.  Wargo possessed a device (the staple) that could cause him harm, but how or if he planned to use it to hurt himself remained unclear.  In short, as in Colburn, nothing in Wargo's behavior made his intentions so obvious that "a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Colburn, 946 F.2d at 1025.

Accordingly, the court finds that summary judgment is warranted for all of the individual defendants on plaintiff's Section 1983 prison-suicide claim.  The evidence does not indicate that Wargo represented a particular vulnerability to suicide when he entered the prison.  Even if he had, the evidence also indicates that defendants' interactions with him did not alert them to this particular vulnerability.  The legal standard in this area provides for liability in cases where prison officials callously ignored what should have been an obvious vulnerability to suicide on the decedent's part.  While the court is sympathetic to the plaintiff's loss, the evidence here does not meet that exacting standard.  As such, the court must dismiss this claim.[9]

### ii.  Policy and Practice

Defendants also seek summary judgment on plaintiff's claims against the County.  Respondeat superior liability does not exist for municipalities in Section 1983 cases.  The Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  City of Canton v. Harris, 489 U.S. 378, 389 (1989).  Further, "[w]hen a plaintiff alleges that a municipality has not directly inflicted an injury, but has caused an employee to do so, stringent standards of culpability and causation must be applied to ensure that the municipality in a §

---

[9]Because the court finds that no evidence could support these initial elements of a prison-suicide-related claim, the court finds it unnecessary to address whether defendants' behavior in caring for Wargo amounted to reckless indifference.

1983 suit is not held liable solely for the conduct of its employee." <u>Reitz v. County of Bucks</u>, 125 F.3d 139, 145 (3d Cir. 1997).   These strict standards exist because "in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 399 (1997).

In order to prevail on such a claim, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." <u>Id.</u> at 403.  Liability attaches either to an official policy or to a "custom" that constitutes a "practice . . . so widespread as to have the force of law." <u>Id.</u> at 404.  In the prison suicide context, "the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to deliberate indifference to whether the detainees succeed in taking their lives." <u>Woloszyn</u>, 396 F.3d at 325 (quoting <u>Colburn</u>, 946 F.2d at 1029-30).

The Defendant County's brief contains exhibits that demonstrate the admissions and suicide prevention policies in place at the prison when Wargo arrived there.  The SCP "Offender Admission Procedures" require officers to refuse "to accept into custody any offender who requires immediate medical attention or

who gives clear signs of serious mental illness." (Offender Admission Procedures, Exh. 1 to County Defendants' Motion for Summary Judgment (Doc. 52-4) at 2).   The staff member in charge of admissions also undertakes an "initial risk assessment on each committed offender based on any evidence that he or she may be suicidal, prone to victimization or violence, or may be a potential protective custody case or present some other special management need." (Id.).  Among the risk factors addressed by the procedures include "suicidal tendencies, history of past suicide attempts or threats;" health problems; substance abuse or addiction; mental health stability; vulnerability/victimization risk; history of sexual assaults, either in or out of prison.  (Id.).  The procedures also require staff to "be alert for offenders who display signs of mental illness or suicidal inclinations."  (Id. at 3).  Staff who discover such problems are required to "refer [the prisoner] to the Shift Lieutenant and medical staff for immediate evaluation while maintaining direct, constant supervision at all times." (Id.).  In that setting, staff is also required to remove "all potentially harmful objects" from the holding cell, '"including belts and shoelaces."  (Id.).

The prison also established a policy on Medical and Health Care Screening (Health Care Screening, Exh. 2 to Defendants' Motion (Doc. 52-5)).  This document serves to describe the procedures used for establishing and maintaining medical records.  (Id.).  The procedures require that a screening form be created to record and document an inmate's health issues.  (Id.).  Those completing the form were required to document information on an inmates "mental health problems or history

27

and mental status"'; "history of substance abuse"; "history of suicide attempt"; and

"other apparent medical or mental health problems." (Id.).  Another local policy

described routine screening procedures established at the prison designed to

identify "acute illness, infectious disease and suicide risk at S.C.P."  (Routine

Screening Procedures, Exh. 3 to County Defendants' Motion (Doc. 52-6).  The policy

requires that a screening take place that "include[s] questions and observation

intended to identify mentally impaired offenders who may have problems adapting to

the detention setting or who may be imminently dangerous to themselves or others."

(Id.).  The local policy on suicide prevention and intervention also provides for "a

suicide prevention program [which] will operate under the direction of mental health

staff."  (Suicide Prevention and Intervention, Exh. 4 to County Defendants' Motion

(Doc. 52-7)).  The policy provides that the program "will operate under the direction

of mental health staff to prevent offenders from harming themselves in any way and

specifically to intervene in suicidal behavior."  (Id.).  The policy required that any

offender "exhibit[ing] behavior that is suicidal, homicidal or otherwise extremely

inappropriate" be moved to a medical cell to be observed.  (Id.).  The policy also

requires that a psychiatric evaluation of the prisoner be arranged.  (Id.).  The policy

also required training of staff members to recognize indicators of potential suicide,

such as a "past history of suicide attempts"; "active discussion of suicide plans";

"drastic" changes "in eating, sleeping or other personal habits"; a "crisis" in the

prisoner's personal life, "such as sentencing"; and a "loss of interest in activities or

relationships the offender had previously enjoyed or engaged in." (Id.).

Finally, a memorandum issued by Deputy Warden Berdanier on August 10, 2000 establishes prison policy for dealing with "suicide threats." (Suicide Threats, Exh. 5 to County Defendants' Brief (Doc. 52-8)).  Under this policy, "if a resident verbalizes a suicidal threat to an officer, that officer should radio the shift Lieutenant to come to the location to evaluate." (Id.).  The Lieutenant, upon hearing "any form of self-harm/suicide ideation . . . should . . . move the resident to a medical or holding cell for observation." (Id.).  In addition, the policy ordered the removal of all clothing from the resident, the provision of a paper gown and the institution of fifteen minute checks. (Id.).  The Lieutenant was also ordered to write a report of the resident's behavior and insure that the Counselor's Officer received the report. (Id.).  If confronted with an actual suicide attempt, the shift Lieutenant was to contact the warden and Counselor Kryjak. (Id.).  The policy also provides that when "a resident responds being a recipient of psychiatric/mental health treatment and is acting in an observable bizarre manner" during intake questioning that resident should be placed in a "holding/medical cell with a standing order of 15 minute checks." (Id.).  The officer was to write a report and issue the inmate normal jail wear, unless his behavior counseled against such treatment. (Id.).

The prison also provided training for corrections officers on prisoner's mental health issues. (See Serious Mental Illness: What Corrections Officers Need to Know, Exh. 11 to County Defendants' Motion (Doc. 52-14)).  Defendants Kryjak,

Flannery and Rizzardi all attended this training, which took place on February 11, 2004.  (Id. at 1).  The materials associated with this training addressed serious mental illnesses, such as schizophrenia, bipolar disorder and major depression.  (Id. at 12).  The program also examined the relationship between depression and substance abuse and dependence.  (Id. at 14).  The training also discussed the prevalence of mental illness in prisons and the likelihood of violent behavior by such inmates.  (Id. at 25-28).   The training on depression included a description of the condition and its symptoms, which included an "utterly dejected mood" and a "hopeless" outlook.  (Id. at 39).  Other symptoms identified included a "loss of interest in other people," a sense of personal worthlessness, a slowing of thoughts and actions, "persistent sadness," guilt, insomnia, oversleeping, lethargy, suicidal thoughts or actions and irritability, complaints of headaches, digestive disorders, and pain.  (Id.).  The training listed likely medications, such as Zoloft, Wellbutrin and Celexa.  (Id.).  Officers also learned of the medication process; the training described the purpose of such medication and its varying uses and effects on patients.  (Id. at 41-42).

The training also provided officers with statistics on national suicide rates and the rates of suicide among various demographic groups and a list of "risk factors" for suicide.  (Id. at 52-53).   Materials noted that "more than 90 percent of suicide victims have had a mental and/or substance abuse disorder."  (Id.) (emphasis in original).  Further, the suicide risk for a person with "a diagnosable depression" is six times

greater than for a person not suffering from the illness.  (Id.).  In prisons, adults "with

depression who also abuse drugs or alcohol" were more likely to attempt suicide.

(Id.).  Though the training noted that "[m]any people have one or more risk factors

and are not suicidal," officers nevertheless received a list of such factors that

included a "prior suicide attempt; family history of mental disorder or substance

abuse; family history of suicide; family violence, including physical or sexual abuse;

firearms in the home; incarceration; and exposure to the suicidal behavior of others."

(Id. at 54) (emphasis in original).  Officers were encouraged in the training to ask

inmates if they had thought about suicide, whether they had a plan to kill themselves

or taken any steps to complete that plan and whether they had ever attempted to kill

or harm themselves in the past.  (Id. at 55).  The training materials also provided lists

of the causes of suicide among prisoners "clues" to warn officers that an inmate

might attempt suicide.  (Id. at 59-60).

Plaintiff points to several alleged deficiencies in these policies and training.

She argues that the forms the prison provided officers for making an initial

assessment of inmates were inadequate.  They did not provide officers with a list of

questions meant to elicit critical information about a prisoner's suicide risk.  The

forms apparently did not encourage officers to ask prisoners about their past and

search for several factors that would have revealed a predisposition to suicide.

Therefore, the defendants were unaware that Wargo had a mother who was an

alcoholic, that he had been the victim of abuse by a stepfather and other caregivers,

31

including a therapist who sexually molested him, that he had been treated for severe

depression, and had attempted suicide multiple times.  Prison counseling policies

also did not require Kryjak to inquire into any of these suicide factors.  Plaintiff also

criticizes prison policies that made Defendant Kryjak the "gatekeeper" for access to

psychiatric services, but did not require that guards report to him any questionable or

inappropriate behavior on an inmate's part. This policy prevented Wargo from

getting the treatment he needed, and prevented Kryjak from learning about Wargo's

destruction of the mattress and the staple lodged (perhaps) in his eye.

        Plaintiff also provides an expert report written by Lindsay M. Hayes, project

director of the National Center on Institutions and Alternatives.  Hayes is editor of the

Jail Suicide/Mental Health Update Newsletter and has authored more than 60

articles on jail suicide prevention.  Hayes terms the prison's suicide policies "grossly

inadequate."  (Assessment of Wargo v. Schuykill County, et Al, Exh. P16 to Plaintiff's

Brief in Opposition (Doc. 63-2) at 12).  Though the policies required that inmates

placed on suicide watch receive a "psychiatric evaluation," the prison employed only

a part-time consulting psychiatrist, and no psychiatrist ever assessed Wargo's risk of

suicide.  (Id. at 12-13).  Hayes contends that the prison had a practice of allowing

persons not trained in psychiatry to discharge inmates from suicide watch, and that

this practice placed potentially suicidal inmates in danger.  (Id. at 13).   The expert

also contends that the prison's written suicide prevention policy was inadequate.  (Id.

at 15-16).   This written policy consisted of two documents, a one-page narrative that

described warning signs and directed the reader to other documents, which included a one-page memorandum on suicide threats written by Deputy Warden Berdanier. (Id. at 16).  This written policy was "grossly inadequate" because it did not provide guidance on how to identify at-risk inmates and offered little guidance on how to manage suicidal inmates.  (Id.).  Further, the policy did not discuss the intake screening process, had an inadequate intake form and had no requirement that staff report dangerous behavior to counselors. (Id.).

Another expert report supplied by the plaintiff, that of Dr. Timothy Ring, a licensed psychologist, also criticized the suicide prevention policies followed by the defendant county.  (See Ring Report).  After explaining the several risk factors which he contends made Wargo likely to commit suicide, Dr. Ring argues that the prison should have engaged in "[a] more in-depth psychological assessment" that would have revealed Wargo's history of depression, the severity of his drug addiction and the chronic pain that led to that addiction.  (Id. at 7).  Such an assessment would have led the prison to an inpatient hospitalization that would have assessed his depressive state and placed him on a more careful and longer suicide watch.  (Id.). Ring also contends that the prison's failure to have a "qualified mental health professional"evaluate Wargo, instead leaving the task to Kryjak, represented an error that led to Wargo's death.  (Id. at 8). Kryjak lacked any professional license to sere as a counselor and had no training in evaluating mental health problems.  (Id. at 9).  Moreover, Ring insists, the qualified mental health professional on the staff was

not available to treat Wargo and was never given critical information about his condition.  (Id. at 11).  Communication between guards and mental health staff was inadequate and fell far below professional standards.  (Id.).

Plaintiff's criticisms of these policies center around what mandating a more detailed collection of data would have revealed to the defendants about Wargo's history of family difficulties, substance and sexual abuse, and past depression and suicide attempts.  Without such information, the jail could not conduct an adequate suicide assessment, and these failings led to Wargo's death.  Prison policies did not contain specific mandates to solicit such information, either to intake processors or to counselors like Kryjak.  Similarly, the prison in practice did not make adequate referrals to a psychiatrist when an inmate engaged in inappropriate and questionable behavior mandatory, but instead relied on guards to report such behavior to Kryjak, who then had the option of referring inmates.  Plaintiff also argues that the prison had a practice or policy of allowing inmates who had recently been on suicide watch or close observation to be transferred to E-Block, where they would have enough isolation to harm themselves.  These policies, she claims, led to Wargo's suicide.

The court finds that plaintiff has not met her burden of presenting evidence that a jury could conclude proves that "the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to deliberate indifference to whether the detainees succeed in taking their lives."

34

Woloszyn, 396 F.3d at 325.  "When evaluating the magnitude and obviousness of the risk involved, the relevant risk is not the suicide risk in the absence of a prevention program but the additional reduction in suicide risks that would have been occasioned by the addition of the proposed training."  Colburn, 946 F.2d at 1030. Here, the additional training proposed by the plaintiff consists in part of an intake form with specific questions that would allegedly lead to a clearer identification of inmates with suicide risks because their personal histories and chemical dependencies.  The evidence indicates, however, that training for guards explained the very risks that plaintiff identifies and urged guards to be aware of them. Similarly, plaintiff's contention that referral to a psychiatrist when inappropriate behavior occurred should have been mandatory and not left to Kryjak's discretion would not seem to a reasonable jury an obvious risk reduction; not all unusual, disruptive, or inappropriate behavior is suicidal, and leaving referral to an experienced counselor does not represent deliberate indifference to a serious risk. Finally, Wargo's confinement in Block E was contrary to prison policy for those on suicide watch; plaintiff has not identified a deficiency in that area. A jury could not find that the prison ignored risk reductions so obvious that deliberate indifference to whether inmates would take their lives occurred.

Accordingly, no reasonable juror could find that the defendants followed policies so deficient that defendants could be liable for Wargo's suicide.  Summary judgment is appropriate for the defendants on plaintiff's failure-to-train claim.

35

### ii. State law claims

Plaintiff raises claims under Pennsylvania law against various defendants. Because the court has found that plaintiff cannot prevail on any of her federal claims, exercising pendant jurisdiction over those state-law claims would be inappropriate here.  If the federal claims in a case are dismissed prior to trial, the state claims should be dismissed as well.  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

## Conclusion

Tristan Wargo's death was a tragedy, and the court sympathizes with the desire of his surviving loved ones to obtain some degree of redress for their loss. Federal law, however, limits recovery in prison suicides to those cases where the behavior of prison officials was so egregious that it represented deliberate indifference to an obvious risk.  That was not the case here.  The court has found that no evidence indicates that plaintiff suffered from a particular vulnerability to suicide when he arrived at the Schuylkill County Prison.  The court has also found that none of the prison's suicide-prevention policies were so lacking as to present a deliberate indifference to the chance that a prisoner would commit suicide.  The court will therefore grant the defendants' motions for summary judgment.  An appropriate order follows.

36

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEAN WARGO,** | : | **No. 3:06cv2156** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **SCHUYLKILL COUNTY;** | : | |
| **GENE BERDANIER, Acting Warden,** | : | |
| **Schuylkill County Prison;** | : | |
| **FRANK CORI, Schuylkill County** | : | |
| **District Attorney;** | : | |
| **WILLIAM BALDWIN, President** | : | |
| **Judge Schuylkill County;** | : | |
| **MICHAEL KRYJAK;** | : | |
| **LT. M. FLANNERY; and** | : | |
| **LT. RIZZARDI,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

   **AND NOW**, to wit, this 14th day of November 2008, the defendants' motions for summary judgment (Docs. 52, 58) are hereby **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.

   **BY THE COURT:**


   s/ James M. Munley          
   **JUDGE JAMES M. MUNLEY**
   **United States District Court**

37